# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------X
JEAN FERRANTE,

Plaintiff, Index No. _________________

- against - **COMPLAINT**

QUEST DIAGNOSTICS INCORPORATED,

Defendant.
------------------------------------------------------------------X

Plaintiff Jean Ferrante, by and through her attorneys, Wardenski P.C. and the Brooklyn Law School LGBTQ+ Advocacy Clinic, alleges as follows:

**PRELIMINARY STATEMENT**

1. From February to October 2025, Plaintiff Jean Ferrante ("Plaintiff" or "Ms. Ferrante") made regular visits to Quest Diagnostics Incorporated ("Defendant" or "Quest") clinics in Brooklyn, New York, for routine testing and bloodwork ordered by her treating physicians.

2. Ms. Ferrante is a transgender woman. Her legal sex, as reflected on her New York State driver's license, is female. Ms. Ferrante has received gender-affirming hormone treatments under the care of her primary care providers for several years, and, as part of this treatment, must undergo routine bloodwork.

3. During her first visit to a Quest clinic (known as a Patient Service Center, or "PSC") in Brooklyn in February 2025, Ms. Ferrante indicated in her patient registration materials that she is female and a transgender woman.

4. Ms. Ferrante visited the Quest location at 224-226 Atlantic Avenue in Brooklyn, New York (the "Atlantic Avenue PSC"), for bloodwork on three subsequent occasions between June and October 2025.

5. At each of the four Quest visits, Ms. Ferrante showed her driver's license, which reflects that her sex is female, to the Quest clinician who performed her blood draw.

6. The lab reports from Ms. Ferrante's first three visits displayed an "F" sex designation, correctly reflecting that Ms. Ferrante is female. However, after her October 2025 visit, Ms. Ferrante received a lab report with an "M" sex designation, with a notation stating, "AN UPDATE OR CORRECTION HAS BEEN MADE TO SEX."

7. Ms. Ferrante was shocked by this change and immediately contacted Quest's Corporate Customer Service department by telephone to request that her sex designation be corrected to female. On information and belief, Quest made no such change.

8. During Ms. Ferrante's efforts to rectify the situation, she was subjected to further discrimination by Quest's customer service representatives who misgendered her on the phone, attempted to deflect blame for the change to Ms. Ferrante's treating providers, and refused to promise that her records would be corrected to accurately reflect that she is female.

9. During these calls, Ms. Ferrante initiated a discrimination complaint to Quest's corporate representatives based on the sex designation change. After claiming to investigate the incident, Quest sent Ms. Ferrante a letter stating that it could not substantiate her claims of discrimination, with no further explanation or indication that her Quest patient records had been or would ever be corrected.

10. Quest's unilateral and unauthorized decision to falsely label Ms. Ferrante as "male," and the subsequent verbal misgendering by Quest representatives during conversations focused on why Quest misidentified Ms. Ferrante's sex as male on her records, significantly exacerbated Ms. Ferrante's symptoms of gender dysphoria symptoms and caused her to experience severe and continuing emotional distress, anxiety, distrust of her health care providers, and other injuries.

11. Ms. Ferrante now brings this civil rights lawsuit against Quest for violating the prohibition on discrimination because of gender under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a)(1)(a), and the prohibition on discrimination because of sex and gender identity in a place of public accommodation under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(2)(a). Ms. Ferrante seeks compensatory damages, punitive damages under the NYCHRL, and all appropriate injunctive and equitable relief to address, remedy the effects of, and prevent the recurrence of the discriminatory treatment to which she was been subjected at Quest, as well as her reasonable attorneys' fees and costs.

## PARTIES

12. Plaintiff is an adult female resident of Brooklyn, Kings County, New York.

13. Quest is a Fortune 500 clinical laboratory company that operates throughout the United States and abroad. Quest was incorporated in Delaware and maintains its principal place of business in New Jersey. In the United States, Quest operates over 2,000 laboratory clinics, called Patient Service Centers ("PSCs"), in 46 states and the District of Columbia. Quest has over 150 PSCs in New York State, at least twenty of which are located in Brooklyn, New York. On information and belief, Quest owns and operates the Atlantic Avenue PSC.

## JURISDICTION AND VENUE

14. This action arises under the NYCHRL and NYSHRL.

15. This Court has personal jurisdiction over Quest pursuant to CPLR § 302(a).

16. Kings County is the appropriate venue pursuant to CPLR § 503(a) because Kings County is both where Plaintiff resides and where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## STATEMENTS OF FACTS

### Plaintiff's Background

17. Ms. Ferrante has an educational background in systems and computational neuroscience. She currently works as a visual artist and writer for a nonprofit in New York City.

18. Ms. Ferrante is a transgender woman.

19. Ms. Ferrante began her gender transition in late 2020, when she started using she/her pronouns and going by the first name Jean instead of her more traditionally male given name. By the end of 2022, Ms. Ferrante was taking anti-androgens to curb the effects of endogenous testosterone and was living as a woman in all aspects of her life, including work, school, and around friends and family.

20. In 2023, Ms. Ferrante obtained a New York State driver's license with the sex designation "F," indicating that her sex is female. In November 2025, Ms. Ferrante legally changed her first name to Jean.

21. In 2023, Ms. Ferrante was diagnosed by a physician with gender dysphoria, defined as clinically significant distress or impairment caused by a marked incongruence between a person's experienced or expressed gender and their sex assigned at birth.

22. In 2024, Ms. Ferrante began receiving gender-affirming health care, specifically feminizing hormone therapy, through Plume, a membership-based fully virtual gender-affirming care medical practice headquartered in Denver, Colorado. Because Plume's practice is virtual, it refers patients to Quest and other third-party laboratories for its patients' lab work.

23. After a referral for bloodwork from her Plume provider, Ms. Ferrante registered as a patient at Quest in February 2025. During her registration, she listed her sex as "Female" and her gender identity as "Transgender male-to-female/Trans Woman." Each time Ms. Ferrante visited a

Quest PSC, she presented her New York State driver's license, indicating her sex is female, to the clinician conducting her blood draw.

**Quest Changes Ms. Ferrante's Sex Designation in Her Patient Records to "Male" without Her Knowledge or Consent**

24. Plume sent lab orders to Quest each time Ms. Ferrante needed bloodwork done.

25. On all lab orders that Plume sent to Quest for Ms. Ferrante, it left the "sex" field blank.

26. When Ms. Ferrante received her bloodwork results from Quest from her first three visits from February to June 2025, the lab reports contained the "F" sex designation, consistent with Ms. Ferrante's legal sex and the sex and gender identity she had self-reported in the Quest patient registration system.

27. Following her fourth and final visit to Quest in October 2025, where she underwent bloodwork at the Atlantic Avenue PSC, Ms. Ferrante received a lab report from Quest on or around October 26, 2025, that contained the "M" sex designation, for "male." A comment under the heading "Patient Information" read, "AN UPDATE OR CORRECTION HAS BEEN MADE TO SEX." Ms. Ferrante was shocked by this change to her patient records, which falsely identified her as "male" and was made with her knowledge or consent.

**Ms. Ferrante Contacts Quest to Inquire About Change of Her Sex Designation from "F" to "M," Submit Discrimination Complaint, and Seek Corrective Action**

28. On October 28, 2025, Ms. Ferrante called Quest's Corporate Customer Service number and spoke to three different customer service representatives. She sought to understand how and why her sex designation was changed, the steps that must be taken to correct it, and what Quest planned to do to ensure that this did not happen in the future, either to her or other transgender patients.

29. Ms. Ferrante explained to the first Quest representative, who identified herself as Bonita, that her sex designation had been changed from "F" to "M" in her patient records, as reflected on her most recent lab report, without her knowledge or consent. During that call, Bonita confirmed that there was an "M" sex designation on Ms. Ferrante's most recent lab report and that all previous reports displayed an "F" sex designation.

30. Ms. Ferrante questioned how that happened and who was responsible. Bonita stated that the clinician who drew Ms. Ferrante's blood would have completed her chart and changed Ms. Ferrante's sex designation from "F" to "M." Ms. Ferrante clarified, "So it was one of your personnel?" Bonita responded, misgendering Ms. Ferrante, "Yes, the technician at the Patient Service Center, yes sir—yes ma'am."

31. After then putting Ms. Ferrante on hold for a long period, Bonita informed Ms. Ferrante that she was "escalating the issue" and that someone else from Quest's corporate office would follow up with her.

32. Later on October 28, 2025, Ms. Ferrante received a call from a second Quest employee who identified herself as Joanne. Joanne told Ms. Ferrante that she was an "escalation representative." Joanne began the phone call by misgendering Ms. Ferrante and referring to her as "sir."

33. Joanne told Ms. Ferrante that her sex designation was changed because Ms. Ferrante's physician sent a bloodwork order to Quest that listed her sex as "male." This was false and, upon information and belief, Joanne had no factual basis to make this incorrect assertion.

34. Ms. Ferrante informed Joanne that the first Quest representative, Bonita, told her that her clinician at the Atlantic Avenue PSC had likely changed her sex designation from "F" to "M." She asked why Joanne was now trying to blame her doctor at Plume and expressed frustration

with the Quest representatives' conflicting explanations for the change. Only then did Joanne admit that she did not know who updated Ms. Ferrante's sex designation and promised to "escalate this conversation" to the supervisor at the Atlantic Avenue PSC. Joanne offered to provide the Atlantic Avenue PSC supervisor with Ms. Ferrante's phone number so the supervisor could reach out to her directly.

35. Ms. Ferrante never received any call or other communication from anyone at the Atlantic Avenue PSC.

36. Joanne also stated that she could not address Ms. Ferrante's "discrimination complaint," and that it would have to be "escalated" to a different team to address.

37. Ms. Ferrante explained that she had made a discrimination allegation to the first representative and did not understand why Joanne would call her if she could not address that complaint. Joanne responded, "It was not stated that this was a discrimination complaint. What I heard, and what was submitted, was a legal threat." Joanne did not explain why Ms. Ferrante's discrimination complaint had been improperly recorded as "a legal threat."

38. Joanne told Ms. Ferrante that she would escalate the issue so that Ms. Ferrante could get the assistance she needed.

39. Following her call with Joanne, on October 28, 2025, Ms. Ferrante received a call from a third Quest representative who identified herself as Cynthia. Cynthia stated that she had contacted the Atlantic Avenue PSC but still did not know who had changed Ms. Ferrante's sex designation. Cynthia also stated that she contacted Ms. Ferrante's doctor at Plume to "pinpoint where [the change to her sex designation] happened."

40. Ms. Ferrante expressed that she did not believe her doctor changed her sex designation on the bloodwork orders. She explained that she had been receiving care from Plume

for a year, without issue; that Plume specializes in transgender healthcare; and that it would not make sense for Plume to suddenly and incorrectly identify her as "male" in their lab orders.

41. Cynthia agreed with Ms. Ferrante that the sex designation change "feels discriminatory."

42. Cynthia told Ms. Ferrante that all she could do was attempt to correct Ms. Ferrante's sex designation in her Quest records. She stated again that she needed to speak to someone from Plume to find out if Jean's doctor had made the error before Quest could take any further action.

43. The next day, October 29, 2025, Cynthia texted Ms. Ferrante and stated that she had been unable to reach Ms. Ferrante's doctors, so she had "escalated" Ms. Ferrante's concerns about discrimination to the Atlantic Avenue PSC, which is what the prior Quest representative, Joanne, had promised to do the day before. Still, Ms. Ferrante never heard from anyone at the Atlantic Avenue PSC. Ms. Ferrante did not respond to this message and was never contacted by Cynthia again.

44. Later that day, Ms. Ferrante received an email from Michelle Davis, a Senior Quest Experience Support Liaison. The email stated that Quest received Ms. Ferrante's report of discrimination and "concluded that it should be addressed through the formal discrimination grievance process," and that Ms. Ferrante would receive a formal written decision within thirty days.

**Plume Confirms That Ms. Ferrante Was Never Listed as "Male" in the Lab Orders It Sent to Quest**

45. After receiving a copy of her October lab report through the Plume patient portal, Ms. Ferrante contacted Plume on October 27, 2025, using the portal's messaging system, to inquire about the change of her sex designation from "F" to "M."

46. On October 29, 2025, a Plume care coordinator, identified as "Ellis T." in the portal, explained that Plume's lab order did not contain any sex designation for Ms. Ferrante, and that "[t]he lab likely filled in the M," referring to the Quest Atlantic Avenue PSC.

47. On October 31, 2025, after further correspondence between Ms. Ferrante and Plume representatives in the Plume patient portal, a nurse at Plume, identified as "April, Lead RN," notified Ms. Ferrante through the portal that Plume's IT team had reviewed Ms. Ferrante's information and determined that the change of Ms. Ferrante's sex designation likely occurred "outside of our system," i.e., by Quest.

48. Ms. Ferrante subsequently requested and obtained copies of all bloodwork orders that Plume sent to Quest for her, including the September 9, 2025, lab request for which she received bloodwork at the Atlantic Avenue PSC in October 2025. The orders confirmed that Ms. Ferrante was never listed as "male" on any documents sent by Plume to Quest.

**Quest Fails to Make Any Changes or Take Further Action to Address the Discrimination Against Ms. Ferrante**

49. On November 26, 2025, Ms. Ferrante received a letter from Quest stating that it "complies with applicable Federal civil rights laws" and that its "internal investigation" into her discrimination complaint was "unable to substantiate allegations of discrimination," without further explanation of what, if anything, Quest did to investigate the issue.

50. At no point did internal investigators from Quest contact Ms. Ferrante regarding her complaint or experiences as a Quest patient. The November 26 letter did not specify why Quest changed Ms. Ferrante's sex designation to "M," who made the change, whether the October lab report or other records had been corrected, or whether any steps had been taken to ensure that Ms. Ferrante would be correctly identified as female in her patient records and treated as a woman in all future Quest visits. On information and belief, Quest took no such steps.

51. The November 26 letter further asserted that Quest "provided additional training to all Brooklyn Atlantic Ave location employees and instructed them to verify name, address, date of birth, and gender when reviewing a patient's ID, this will eliminate errors, and ensure patients feel respected."

52. On information and belief, the Atlantic Avenue PSC clinician's unilateral and unauthorized decision to change Ms. Ferrante's recorded sex designation from "F" to "M," despite reviewing her driver's license and having access to Ms. Ferrante's demographic information in her patient records, was intentional and discriminatory.

53. On information and belief, Quest, by failing to adequately respond to Ms. Ferrante's complaint or take sufficient corrective action, acquiesced to and condoned the discriminatory conduct of its employees and agents.

**INJURIES TO PLAINTIFF**

54. The acts and omissions of Quest and its employees and agents complained of herein have caused Ms. Ferrante to suffer severe and continuing emotional distress and other injuries.

55. This discriminatory conduct has exacerbated Ms. Ferrante's gender dysphoria symptoms and caused her to experience heightened symptoms of depression, anxiety, disordered sleep and eating, self-isolation, and exacerbated symptoms of Complex Post Traumatic Stress Disorder ("c-PTSD"), a previously diagnosed condition.

56. Due to the discriminatory conduct complained of herein, Ms. Ferrante felt unsafe, unwelcome, and uncomfortable receiving additional services at Quest. Because continuing her primary care at Plume required her to obtain bloodwork at Quest, Ms. Ferrante was forced to seek a new provider that would not require her to visit Quest facilities. As a result, she spent approximately five months finding a new primary care team that could both provide competent

gender-affirming care and perform laboratory testing "in-house," without the need to obtain bloodwork from a third-party testing facility.

57. While searching for new doctors, Ms. Ferrante was also applying to jobs, which was made more difficult by the debilitating anxiety and depression symptoms caused by Quest's discriminatory actions. Faced with this recent and unexpected discrimination by a health care provider, Ms. Ferrante was fearful that any interaction with a new person or institution would subject her to discrimination because she is transgender, impeding her job search and career opportunities.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Discrimination on the Basis of Gender by a Place or Provider of Public Accommodation in Violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4)(a)(1)(a)

58. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

59. Under the NYCHRL, "[i]t shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent, or employee of any place or provider of public accommodation . . . [b]ecause of any person's actual or perceived . . . gender, . . . [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation . . . ." N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

60. Quest is a "place or provider of public accommodation" under the NYCHRL. N.Y.C. Admin. Code § 8-102.

61. Under the NYCHRL, "[t]he term 'gender' includes actual or perceived sex, gender identity and gender expression, including a person's actual or perceived gender-related self-image, appearance, behavior, expression or other gender-related characteristic, regardless of the sex assigned to that person at birth." N.Y.C. Admin. Code § 8-102.

62. NYCHRL implementing regulations, adopted in 2017, provide that "[a] covered entity's deliberate refusal to use an individual's self-identified name, pronoun and gendered title constitutes a violation of [the NYCHRL] where the refusal is motivated by the individual's gender," and that "[t]his is the case regardless of the individual's sex assigned at birth, anatomy, gender, medical history, appearance, or the sex indicated on the individual's identification," except in limited circumstances not applicable here. 47 RCNY § 2-06(a).

63. In NYCHRL enforcement guidance, the New York City Commission on Human Rights defines "gender identity" as "the internal deeply held sense of one's gender which may be the same as or different from one's sex assigned at birth. A person's gender identity may be male, female, neither or both, i.e., non-binary or genderqueer." The guidance also defines "sex" as "a combination of chromosomes, hormones, internal and external reproductive organs, facial hair, vocal pitch, development of breasts, gender identity, and other characteristics. Gender identity is the primary determinant of a person's sex." N.Y.C. Comm'n on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Gender Identity or Expression: Local Law No. 3 (2002); N.Y.C. Admin. Code § 8-102(23)* (last updated Feb. 5, 2019).[1]

64. Quest's failure to correctly designate Ms. Ferrante's female sex in her medical records and its representatives' misgendering of Ms. Ferrante is a violation of the NYCHRL's prohibition on gender-based discrimination by a place or provider of public accommodation.

---

[1] *Available at* https://www.nyc.gov/site/cchr/law/legal-guidances-gender-identity-expression.page [https://perma.cc/EF4W-BQF7].

65. Through the acts and omissions of Quest and its personnel and agents complained of herein, Quest, as a place or provider of public accommodation, has discriminated against Ms. Ferrante based on gender in violation of the NYCHRL.

66. Ms. Ferrante has been injured by this discriminatory conduct and has suffered damages as a result.

67. Quest's discriminatory conduct complained of herein was malicious, made with reckless indifference to Ms. Ferrante's protected rights, and amounted to a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

**SECOND CAUSE OF ACTION**

**Discrimination on the Basis of Sex and Gender Identity or Expression in a Place of Public Accommodation in Violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a)**

68. Ms. Ferrante repeats and incorporates by reference all of the allegations set forth above.

69. Under the NYSHRL, it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, . . . because of the . . . gender identity or expression [or] sex . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." N.Y. Exec. Law § 296(2)(a).

70. Quest and its individual Patient Service Centers are "place[s] of public accommodation" as defined by the NYSHRL. N.Y. Exec. Law § 292(9).

71. Through the acts and omissions of Quest and its employees and agents complained of herein, Quest has discriminated against Ms. Ferrante because of her sex and gender identity or expression in a place of public accommodation, in violation of the NYSHRL.

72. Ms. Ferrante has been injured by this discriminatory conduct and has suffered damages as a result.

**REQUEST FOR RELIEF**

WHEREFORE, Ms. Ferrante respectfully requests that this Court:

a. Enter a declaratory judgment that Quest's discriminatory acts and omissions complained of herein, and any related policies, practices, procedures, and customs underlying those acts and omissions, violated Ms. Ferrante's rights under the NYCHRL, N.Y.C. Admin. Code § 8-107(4)(1)(a), and the NYSHRL, N.Y. Exec. Law § 296(2)(a).

b. Award Ms. Ferrante damages, in an amount to be proven at trial, to fully compensate her for her emotional distress, humiliation, mental anguish, pain and suffering, and other economic and noneconomic losses, in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

c. Award Ms. Ferrante punitive damages in an amount sufficient to punish Quest for violating Ms. Ferrante's rights and to deter similar unlawful conduct in the future;

d. Order all other injunctive and equitable relief necessary to cure the adverse effects of Quest's discriminatory actions and prevent their recurrence;

e. Award Ms. Ferrante her reasonable attorneys' fees and costs as authorized by N.Y. Exec. Law § 297(10) and N.Y.C. Admin. Code § 8-502(g); and

f. Order such other relief as this Court deems just and equitable.

[signature block on next page]

DATED: August 4, 2026
New York, New York

Respectfully submitted,

WARDENSKI P.C.

By: <u>*/s/ Joseph J. Wardenski*</u>
Joseph J. Wardenski
Mack C. Karbon*
134 West 29th Street, Suite 709
New York, NY 10001
(347) 227-2500
joe@wardenskilaw.com
mack@wardenskilaw.com

– and –

BROOKLYN LAW SCHOOL LGBTQ+
ADVOCACY CLINIC

Susan Hazeldean, Director
250 Joralemon Street
Brooklyn, NY 11201
(718) 780-7575
susan.hazeldean@brooklaw.edu

*Attorneys for Plaintiff Jean Ferrante*

* Pro hac vice motion forthcoming